984 A.2d 921 (2009)
411 N.J. Super. 176
G.D.,[1] Plaintiff/Respondent/Cross-Appellant,
v.
Bernard KENNY and the Hudson County Democratic Organization, Inc., Defendants/Appellants/Cross-Respondents.
G.D., Plaintiff/Respondent/Cross-Appellant,
v.
Craig Guy; Harold E. Demellier, Jr., a/k/a Bud Demellier; Raul Garcia, a/k/a Rudy Garcia; Nicole Harrisongarcia, Defendants/Appellants/Cross-Respondents, and
Neighborhood Research Corp., d/b/a Mountaintop Media; Richard K. Shaftan, a/k/a Rick Shaftan; Careyann Shaftan, Defendants-Respondents.
No. A-3005-08T3.
Superior Court of New Jersey, Appellate Division.
Submitted September 15, 2009.
Decided December 21, 2009.
*925 McManimon & Scotland, L.L.C., Newark, attorneys for appellants/cross-respondents Bernard Kenny, The Hudson County Democratic Organization, Inc., Craig Guy, Harold E. Demellier, Raul Garcia and Nicole Harrison-Garcia (William W. Northgrave and Jaime R. Placek, on the brief).
Cohn Lifland Pearlman Herrmann & Knopf, L.L.P., attorneys for respondent/cross-appellant G.D. (Charles R. Cohen and Alex Pisarevsky, Saddle Brook, on the brief).
Michael Patrick Carroll, Morristown, attorney for respondents Neighborhood Research Corp., Richard K. Shaftan, and CareyAnn Shaftan, who rely on the briefs of appellants/cross-respondents Bernard Kenny, The Hudson County Democratic Organization, Inc., Craig Guy, Harold Demellier, Raul Garcia and Nicole Harrison-Garcia.
Before Judges WEFING, GRALL and LeWINN.
The opinion of the court was delivered by
WEFING, P.J.A.D.
In this appeal, we are called upon to consider whether defendants, sued for libel for preparing and circulating political flyers referring to plaintiff's criminal history, may assert truth as a defense when plaintiff's conviction has been expunged in accordance with N.J.S.A. 2C:52-1 to -32. We conclude that defendants may assert *926 the defense of truth and reverse the trial court's order.

I
The issue arises in the following context. In 2007, there was a split between two different wings of the Democratic Party in Hudson County, and each wing supported a different candidate in the primary election to select a candidate to run in the general election for State Senate. One candidate was Brian Stack; his organization was known as Democrats for Hudson County. Plaintiff had worked for Stack as a part-time aide some years earlier when Stack was a member of the Hudson County Board of Freeholders. By the time of the primary campaign, Stack was no longer on the Board of Freeholders but was a member of the State Assembly as well as the Mayor of Union City. Defendants believed that plaintiff supported Stack in his primary campaign for the State Senate nomination, although plaintiff maintained that he was not actively working for Stack's candidacy.
Defendant, The Hudson County Democratic Organization, Inc., (HCDO) and its Chief Executive Officer, defendant Bernard Kenny, and its Executive Director, defendant Craig Guy, supported a candidate other than Stack. They were assisted in this campaign by defendants Howard Demellier, Raul ("Rudy") Garcia (whom Stack had defeated in an earlier election for Mayor of Union City) and Nicole Harrison-Garcia. These defendants hired defendant Neighborhood Research Corp., a firm that engages in political consulting and advertising, to assist them in opposing Stack's candidacy and promoting their own candidate. Defendants Richard Shaftan and CareyAnn Shaftan are the principals of Neighborhood Research. For ease of understanding we shall refer to these three defendants jointly as "Shaftan."
Shaftan, through methods that are not entirely clear from the record before us, became aware that plaintiff had, in the past, involvement with the criminal justice system. Shaftan was provided with a copy of a 1993 judgment of conviction evidencing plaintiff's conviction for second-degree possession of a controlled dangerous substance with intent to distribute, in violation of N.J.S.A. 2C:35-5a(1), 5b(1). The judgment of conviction recorded that plaintiff had, in addition, originally been charged with possession of a controlled dangerous substance, N.J.S.A. 2C:35-10a(1), and distribution of a controlled dangerous substance, N.J.S.A. 2C:35-5a(1), 5b(1), and had been sentenced to serve five years in prison.
Based upon that information, two flyers were prepared. Both were in English and Spanish. The first contained the following text in English:
IT'S THE COMPANY YOU KEEP And the sleazy crowd Brian Stack surrounds himself with says a lot about who Stack is.
COKE DEALERS AND EX-CONS.
YOU READ ABOUT DRUG DEALER HECTOR MARTINEZ, A STACK CRONY CURRENTLY "WORKING" AT THE COUNTY VOCATIONAL SCHOOL AFTER BEING DEPORTED FOR SELLING COCAINE NEAR A PUBLIC SCHOOL.
NOW READ ABOUT STACK REFORMER # 2
Like Martinez, [G.D.] is also a DRUG DEALER who went to JAIL for FIVE YEARS for selling coke near a public school. After getting out of jail, [D.] landed a job as a highly paid "aide" to Mayor Stack.
Today, [D.] is an aide at the controversial Union City Day Care Center  assisting *927 the embattled Mayor's estranged wife
THEY'RE A PROBLEM IN STACK'S CITY HALL TOO. AND NOW HE WANTS A PROMOTION???
This flyer showed G.D.'s photograph next to the textual references to him.
The second flyer contained the following text in English:.
TEAM STACK: COKE DEALERS. GUN RUNNERS. EX-CONS THE MORE PEOPLE KNOW, THE MORE QUESTIONS THEY HAVE ABOUT BRIAN STACK.
UNION CITY MAYOR BRIAN STACK'S CLOSEST POLITICAL OPERATIVES: GUN RUNNERS, COKE DEALERS, EX-CONS.
We all know the threat that drugs and illegal guns have in our communities. But not Brian Stack. He continues to surround himself with one shady character after another  not one but two convicted drug dealers and ex-cons, whom Stack got a high paying county job and a drugged out gun running lowlife who was his campaign manager.
BRIAN STACK PREACHES "REFORM" AND "GOOD GOVERNMENT" BUT HIS ADMINISTRATION IS MADE UP OF SLEAZY DRUG DEALERS AND OTHERS WHO SHOULD BE NOWHERE NEAR THE PUBLIC TREASURY.
This second flyer, although it did not mention plaintiff by name, also displayed his picture. Each flyer contained the notation that it had been "[p]aid for by the Hudson County Democratic Organization." More than 17,000 copies of each flyer were printed. Copies were sent to more than 8,000 households in Union City.
Unbeknownst to Shaftan, G.D. some years after his conviction, had successfully petitioned to have his conviction expunged, and an order of expungement had been entered in June 2006. One portion of that order provided "that the arrest which is the subject of this Order shall be deemed not to have occurred. . . ." Despite the order of expungement, the website of the Department of Corrections listed information about plaintiff's conviction and sentence as late as August 2008. That information was removed during the pendency of this lawsuit.
Plaintiff responded to these flyers by filing suit. In June 2007, he sued Kenny and the HCDO for defamation and intentional infliction of emotional distress. In May 2008, he filed a second action, in which he named Guy, Demellier, Garcia, Harrison-Garcia, and Shaftan, as defendants. This second complaint asserted claims of defamation, negligent or intentional infliction of emotional distress, invasion of privacy, and civil conspiracy. The two actions were consolidated, and the parties filed cross-motions. The HCDO and Kenny filed a motion to dismiss, the remaining defendants filed a motion for summary judgment, and plaintiff filed a motion to bar defendants from relying on the defense of truth. The trial court denied all these motions, and the parties filed motions for leave to appeal, which we granted.
Defendants argue on appeal that because the information contained in the flyers was true, they cannot be the subject of a claim for defamation. Plaintiff, on the other hand, contends that defendants are not entitled to rely on the defense of truth in light of the fact that his conviction was expunged. For the following reasons, we agree with defendants.
A defamation claim has three elements: "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that *928 statement to a third party; and (3) fault amounting at least to negligence by the publisher." Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 585, 969 A.2d 1097 (2009) (quoting DeAngelis v. Hill, 180 N.J. 1, 13, 847 A.2d 1261 (2004)).
The trial court approached the parties' motions with a consideration of the third element: what standard should be applied to measure defendants' conduct, that is, could they be found liable if they were merely negligent, or would plaintiff have to establish actual malice to prevail? The trial court ruled that discovery was required before that third element could be addressed. It thus denied the respective motions.

II
Defendants argue on appeal that the threshold question, however, is whether the flyers can be the subject of a claim for defamation at all. Defendants contend that because the information contained in the flyers is true, it cannot support a defamation claim. Plaintiff, on the other hand, contends that defendants are not entitled to rely on the defense of truth in light of the fact that his conviction was expunged. For the following reasons, we agree with defendants in both respects. The first question that must be resolved is whether the flyers are defamatory. See Salek v. Passaic Collegiate Sch., 255 N.J.Super. 355, 361, 605 A.2d 276 (App.Div.1992) (noting that "[t]he issue of fault in a defamation case arises only after a defamatory communication . . . has been established"). We also agree that these flyers are, as a matter of law, not defamatory because the information they contain is true.
A determination whether a statement has a defamatory meaning involves a consideration of three factors: the content of the statement, whether the statement is verifiable, and the context in which the statement is made. Leang, supra, 198 N.J. at 585, 969 A.2d 1097.
In order to evaluate a statement's content, a court must consider "the fair and natural meaning that will be given to the statement by reasonable persons of ordinary intelligence." When considering verifiability, a court must "determine whether the statement is one of fact or opinion." While a statement of opinion generally enjoys absolute immunity, a statement of fact is actionable "[o]nly if the statement suggested specific factual assertions that could be proven true or false." Finally, to decide whether a statement is capable of a defamatory meaning, a court must consider "the listener's reasonable interpretation, which will be based in part on the context in which the statement appears."
[Ibid. (citations omitted).]
If a statement falsely attributes criminality to an individual, it is defamatory as a matter of law. Romaine v. Kallinger, 109 N.J. 282, 291, 537 A.2d 284 (1988).
A truthful statement will not support a cause of action based on defamation, and the truth of the statement is an absolute defense to a claim of defamation. Ward v. Zelikovsky, 136 N.J. 516, 530, 643 A.2d 972 (1994) (stating, "True statements are absolutely protected under the First Amendment."). Further, "[w]hether the meaning of a statement is susceptible of a defamatory meaning is a question of law for the court." Id. at 529, 643 A.2d 972. If a statement is not legally defamatory, summary judgment is appropriate. Rocci v. Ecole Secondaire Macdonald-Cartier, 165 N.J. 149, 158, 755 A.2d 583 (2000).
It is undisputed that plaintiff was, in fact, arrested and convicted of possession of a controlled dangerous substance with the intent to distribute it. Plaintiff contends that the subsequent expungement *929 of the record of his arrest and conviction renders defendants' reporting of them false and defamatory. In our judgment, plaintiff's successful expungement of this record does not make defendants' statements about that record "false."
N.J.S.A. 2C:52-1 to -32 governs expungement. The remedy of expungement is intended to provide "relief to the one-time offender who has led a life of rectitude and disassociated himself with unlawful activity. . . ." N.J.S.A. 2C:52-32. Expunged records are not destroyed; rather, the statute directs that they are to be "removed from the files of the agencies" notified of the application and "placed in the control of a person who has been [so] designated by the head of each agency. . . ." N.J.S.A. 2C:52-15. This statute further provides that any subsequent requests for information shall receive the response that "there is no record information." Ibid.
N.J.S.A. 2C:52-27 states that, with certain exceptions, following the entry of an order of expungement, "the arrest, conviction and any proceedings related thereto shall be deemed not to have occurred. . . ." The information contained within expunged records can, nonetheless, be used in certain contexts. See, e.g., N.J.S.A. 2C:52-19 (certain uses of expunged records allowed by court order); N.J.S.A. 2C:52-20 (permitting use of expunged records in connection with treatment or diversion programs); N.J.S.A. 2C:52-21 (permitting use of expunged records in connection with setting bail, preparing a presentence report or sentencing); N.J.S.A. 2C:52-22 (permitting use of expunged records by the Parole Board); N.J.S.A. 2C:52-23 (permitting use of expunged records by the Department of Corrections for purposes of classification)
The Legislature has designed the present day expungement procedures so that expunged records can be used in situations such as sentencing, bail setting, parole hearings, and future expungement efforts. In addition, expunged records shall be revealed if the petitioner later seeks employment within the judicial branch or with a law enforcement agency.
[State v. A.N.J., 98 N.J. 421, 428, 487 A.2d 324 (1985) (citations omitted).]
Our expungement statute does not directly address the question whether expunged records may be used in connection with an action for defamation, and our research has not led to a reported New Jersey case which has discussed the question. Two states, however, have by statute addressed the question. A California statute creates a mechanism to seal a minor's misdemeanor record. Cal.Penal Code § 1203.45 (Dearing 2009). Subsection (f) of the statute sets forth the following provision:
In an action or proceeding based upon defamation, a court, upon a showing of good cause, may order the records sealed under this section to be opened and admitted into evidence. The records shall be confidential and shall be available for inspection only by the court, jury, parties, counsel for the parties, and any other person who is authorized by the court to inspect them. Upon the judgment in the action or proceeding becoming final, the court shall order the records sealed.
[§ 1203.45(f).]
Oregon has a somewhat analogous provision in its statute.
For purposes of any civil action in which truth is an element of a claim for relief or affirmative defense, the provisions of subsection (3) of this section providing that the conviction, arrest or other proceeding be deemed not to have occurred do not apply and a party may apply to *930 the court for an order requiring disclosure of the official records in the case as may be necessary in the interest of justice.
[Or.Rev.Stat. § 137.225(9).]
Oregon has had occasion to consider this portion of its expungement statute. Bahr v. Statesman Journal Co., 51 Or.App. 177, 624 P.2d 664, review denied, 291 Or. 118, 631 P.2d 341 (1981). In that case, the plaintiff was a candidate for the position of county commissioner, and the defendant newspaper interviewed him during the course of the campaign. Id. at 665. In that interview, he was asked about an earlier conviction for embezzlement. Ibid. Based upon the fact that the conviction had been expunged, he said he had not been convicted of a crime. Ibid. In reporting on the interview, the newspaper stated that the plaintiff had refused to discuss his conviction and noted that he had served four months in jail. Id. at 665-66.
The plaintiff filed suit for defamation, alleging that since his conviction had been expunged, it had not occurred as a matter of law and that his response during the interview was truthful. Ibid. The Oregon Court of Appeals ruled that the provision of the expungement statute set forth above permitted the newspaper to rely on the expunged record to assert its defense of truth; the court granted the defendant's motion to dismiss. Id. at 666-67.
Plaintiff contends that Bahr contains no guidance for this matter because the Oregon court rested its decision on a specific aspect of the Oregon statute. We are not persuaded by this argument because its logical corollary is that a state legislature is vested with the power to control the viability of the defense of truth to a libel action. Such a position would be repugnant to the core values of the First Amendment.
[S]peech related to matters of public concern "occupies the `highest rung of the hierarchy of First Amendment values[.]'" Such speech "requires maximum protection." Thus, when alleged defamatory remarks touch on a matter of public concern, "the interests of free speech justify, and fairness to individual reputation permits, application of a strict and high burden of proof to establish actionable defamation."
[Rocci, supra, 165 N.J. at 156, 755 A.2d 583 (citations omitted); accord, LoBiondo v. Schwartz, 323 N.J.Super. 391, 407, 733 A.2d 516 (App.Div.), certif. denied, 162 N.J. 488, 744 A.2d 1211 (1999), rev'd in part on other grounds, 199 N.J. 62, 970 A.2d 1007 (2009).]
We are not persuaded by plaintiff's contention that legislative history indicates an intent by the Legislature not to permit use of an expunged conviction to defend against a defamation suit. Plaintiff's argument rests upon one sentence in the January 12, 1960, statement of Governor Robert B. Meyner explaining his veto of a proposed amendment to the then-existing expungement statute. We cannot conclude, as plaintiff urges, that this sentence in some manner elucidates the intent of the Legislature when it adopted the current expungement statute nearly twenty years later.
Even without such explicit statutory authorization, moreover, two other appellate courts, have concluded that expungement of a criminal conviction does not, as a matter of law, preclude reference to records of the conviction in a subsequent defamation suit.
In Stephens v. Van Arsdale, 227 Kan. 676, 608 P.2d 972, 974-75 (1980), the Supreme Court of Kansas considered a challenge by a newspaper to a refusal to permit it to examine records relating to expunged criminal convictions. Part of *931 its argument was the assertion that such a denial had "the effect of denying to them the right to assert truth as a defense in actions for libel and slander." Id. at 985. In dicta, the court noted "the inherent power which courts have over their official records. In an unusual case, where a former offender is directly involved in civil litigation, a district court might in its discretion permit the release of certain documents contained in an expunged file in order to achieve the ends of justice." Id. at 986.
The plaintiff in Rzeznik v. Chief of Police of Southampton, 374 Mass. 475, 373 N.E.2d 1128, 1130 (1978), a decision by the Supreme Judicial Court of Massachusetts, had obtained an order in 1974 sealing the record of his two felony convictions, entered against him more than twenty years earlier. He then obtained licenses to carry and sell firearms and to sell ammunition. Ibid. It is clear from the court's opinion that a certain level of animosity existed between the plaintiff and the defendant, against whom the plaintiff had lodged conflict of interest claims. Id. at 1131. Shortly after the plaintiff testified before a grand jury with respect to that issue, the defendant sought to reclaim and revoke the plaintiff's firearms licenses, contending that his prior convictions precluded him from holding them. Ibid. The plaintiff asserted that the defendant's revelation of his earlier sealed convictions was slanderous. Id. at 1130. The court summarized his argument in the following fashion:
In characterizing as slanderous the defendant's publication of the fact of the prior felony convictions, the plaintiff concedes that truth is an absolute defense. He argues, however, that where the record of a conviction has been sealed . . . the fact of the conviction essentially is erased, so that the conviction is no longer a fact for any purposes other than those enumerated in the statute. Additionally, the plaintiff argues that, even if the statements were true, the defendant could not prove truth as an affirmative defense, because [the statute] provides: "[Nor shall such sealed records be admissible in evidence]. . . or used in any way in any court proceedings . . . except in imposing sentence. . . ."
[Id. at 1133.]
The Massachusetts court rejected this argument. It noted that under the sealing statute, the information "is in fact maintained. . . and is accessible to law enforcement agencies, courts, and appointing authorities. . . ." Id. at 1133. Our statute is similar in scope and effect; the information with respect to an expunged conviction is not destroyed and remains accessible in limited situations. The Massachusetts court also noted that nothing within the statute suggested "that, once the fact of a conviction is sealed, it becomes nonexistent, and hence untrue for the purposes of the common law of defamation." Id. at 1133.
Both in Bahr and in Rzeznik the courts noted that the plaintiffs had, in their pleadings and stipulations, admitted the fact of their earlier convictions. Bahr, supra, 624 P.2d at 666; Rzeznik, supra, 373 N.E.2d at 1133-34. The Bahr court noted that this admission made the defendant's statement that the plaintiff had been convicted true. Supra, 624 P.2d at 667. The Rzeznik court noted that this made it unnecessary to consider whether the Massachusetts statute would preclude the admissibility of these convictions during the litigation. Supra, 373 N.E.2d at 1133.
Plaintiff in this matter evidently sought to avoid that conundrum by not explicitly admitting the fact of his conviction in his complaint or in his papers in support of his *932 motion for partial summary judgment. Rather, in both of the complaints, plaintiff characterized the flyers as false and untrue. In the Statement of Uncontested Facts he submitted in support of his partial summary judgment motion, he attached a copy of the expungement order. This order, however, would have no legal significance if there were not an underlying conviction. Thus, like the Oregon and Massachusetts courts before us, we see no value in permitting plaintiff to use the expungement statute as a sword, rather than the shield it was intended to be. Ulinsky v. Avignone, 148 N.J.Super. 250, 372 A.2d 620 (App.Div.1977) (holding that defendants were entitled to assert information contained in records that had been expunged to defend against a claim of malicious prosecution even though the statute then in effect precluded release of that information "for any reason.").
Plaintiff also contends that the flyers were inaccurate because one of them referred to him as having sold drugs near a public school. His conviction, he stresses, was for possession with intent to distribute under N.J.S.A. 2C:35-5, not for possession with intent to distribute within one thousand feet of school property, N.J.S.A. 2C:35-7. He also stresses that he did not serve five years in prison. Again, we are not persuaded.
A statement can be "fairly accurate" and still be considered the truth as a defense to a defamation claim. LoBiondo, supra, 323 N.J.Super. at 412-13, 733 A.2d 516; see also Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 516, 111 S.Ct. 2419, 2432-33, 115 L.Ed.2d 447, 472 (1991) (noting that even at common law, "substantial truth" sufficed to defeat a claim of defamation).
Here, the statements were fairly accurate. The flyer did not refer to a specific statutory violation, but merely that plaintiff's offense occurred "near" a public school. Union City is a municipality that is one mile long and one-quarter mile wide; the Union City Board of Education operates twelve public schools. Gary Ramella, Union City Bd. of Educ., Office of Tech., http://archive.techlearning.com/ techlearning/pdf/events/techforum/ ny03/vault/BottomLine_Handout.pdf. Considering the city's small geographic area, and the number of schools within that area, we do not consider the reference to "near a public school" to be misleading or unfair. And, plaintiff was sentenced to a five-year prison term, whatever the period of incarceration he actually served may have been.

III
The remaining issue which the parties have addressed before us is whether plaintiff's remaining claims may survive in the face of a dismissal of his defamation claim. We are convinced they may not.

A
Plaintiff claims that defendants, by publishing these flyers, either intentionally or negligently inflicted emotional distress upon him. There are four elements in a claim for intentional infliction of emotional distress. Griffin v. Tops Appliance City, Inc., 337 N.J.Super. 15, 22-23, 766 A.2d 292 (App.Div.2001). Plaintiff has the burden of establishing that defendants (1) acted intentionally or recklessly, and (2) outrageously and (3) proximately caused (4) severe distress. Ibid. (quoting Buckley v. Trenton Sav. Fund Soc'y., 111 N.J. 355, 366-67, 544 A.2d 857 (1988)). A court determines whether outrageous conduct could possibly be found as a matter of law based on the facts, while a jury determines if in fact that conduct was *933 outrageous. Taylor v. Metzger, 152 N.J. 490, 509-10, 706 A.2d 685 (1998).
[I]f an intentional tort count . . . is predicated upon the same conduct on which the defamation count is predicated, the defamation cause completely comprehends the malicious interference cause. That is to say, if the alleged defamation is not actionable, then its consequences are also not actionable because the conduct that caused those consequences was privileged. The Supreme Court has also so held in considering the interplay between defamation and intentional infliction of emotional distress based on the same conduct. See Decker v. The Princeton Packet, 116 N.J. 418, 432, 561 A.2d 1122 (1989), noting that "[t]here is, in other words, a certain symmetry or parallel between claims of emotional distress and defamation that calls for consistent results." It would obviously be intolerably anomalous and illogical for conduct that is held not to constitute actionable defamation nevertheless to be relied on to sustain a different cause of action based solely on the consequences of that alleged defamation. Thus, since there was no actionable defamation here, there can be no claim for damages flowing from the alleged defamation but attributed to a different intentional tort whose gravamen is the same as that of the defamation claim.
[LoBiondo, supra, 323 N.J.Super. at 417, 733 A.2d 516.]
A claim for negligent infliction of emotional distress also has four elements. Russo v. Nagel, 358 N.J.Super. 254, 269, 817 A.2d 426 (App.Div.2003). The four elements are: (1) "a duty of reasonable care" was owed by the defendant to the plaintiff, (2) that duty was breached, (3) the "plaintiff suffered severe emotional distress," and (4) the breach was a proximate cause of injury. Ibid. Just as with a claim of intentional infliction of emotional distress, where defamation fails, so should a claim for negligent infliction of emotional distress. Salek v. Passaic Collegiate Sch. supra, 255 N.J.Super. at 361, 605 A.2d 276.
Even if expunged, the fact of defendant's conviction is the truth. Approximately sixteen years passed between the original arrest and the expungement. For that entire time, the conviction was a matter of public record. Furthermore, as we have noted, as late as August 2008, the record was still available on the website of the Department of Corrections. Information that has been publicly available for such a long time cannot be said to cause serious, mental distress to the plaintiff when it is published, even after an expungement.
Plaintiff's claims of the intentional and the negligent infliction of emotional distress against the defendants must be dismissed.

B
Plaintiff also asserts various privacy torts against defendants, including false light, publication of private facts and invasion of privacy. One of the torts, misappropriation of name, only applies to the Shaftan defendants.
These claims must fail because they are based on a true fact. "The tort of false light has two elements: (1) the false light in which the other was placed would be highly offensive to a reasonable person; and (2) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." Leang, supra, 198 N.J. at 589, 969 A.2d 1097 (quotations omitted). "[A] fundamental requirement of the false light tort is that the disputed publicity be in fact false, *934 or else `at least have the capacity to give rise to a false public impression as to the plaintiff.'" Romaine, supra, 109 N.J. at 294, 537 A.2d 284 (citation omitted). As there is no falsity of the statement, there can be no false light tort.
"The invasion of privacy by unreasonable publication of private facts occurs when it is shown that `the matters revealed were actually private, that dissemination of such facts would be offensive to a reasonable person, and that there is no legitimate interest of the public in being apprised of the facts publicized.'" Id. at 297, 537 A.2d 284 (citation omitted).
The fact of plaintiff's conviction is certainly not private as all criminal arrests and convictions are matters of public record. Furthermore, this claim cannot survive even if this court should rule that the expungement renders the conviction as though it never occurred. This is because the disclosure of the conviction would not be the disclosure of a private fact as it would be considered to have never occurred and thus cannot be a private fact.
The final claim, misappropriation of one's name, only applies to the Shaftan defendants. Simply using an individual's name is not enough to constitute misappropriation. Bisbee v. John C. Conover Agency, Inc., 186 N.J.Super. 335, 342-43, 452 A.2d 689 (App.Div.1982). There must also be a commercial purpose. Ibid. Plaintiff claims the Shaftan defendants had a commercial purpose because they were hired by defendant HCDO to produce the flyers. However, the speech deals with a matter of public concern, an election contest, and is not commercial speech. To suggest it is commercially motivated speech because someone is paid to produce the flyer would be akin to saying any time a newspaper uses someone's name it is misappropriation because newspapers cost money and individuals are paid to produce newspapers. Speech that concerns a political campaign is not commercially motivated even though incidentally people make money from producing it.
Plaintiff's remaining claim is one for civil conspiracy. "In New Jersey, a civil conspiracy is `a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.'" Banco Popular N. Am. v. Gandi, 184 N.J. 161, 177, 876 A.2d 253 (2005) (quoting Morgan v. Union County Bd. of Chosen Freeholders, 268 N.J.Super. 337, 364, 633 A.2d 985 (App.Div.1993), certif. denied, 135 N.J. 468, 640 A.2d 850 (1994)). Because the flyers in question contain truthful information and are substantially accurate, they cannot serve as the basis for a claim for civil conspiracy. Defendants were entitled to the dismissal of plaintiff's entire complaint against them.
The orders under review are reversed, and the matter is remanded to the trial court for entry of an order dismissing plaintiff's complaint.
NOTES
[1] The pleadings originally filed in this matter referred to plaintiff by his full name. Sometime after these filings, the trial court entered a consent order making the matter confidential. In light of that order and in light of the subject matter of this appeal, we shall refer to plaintiff only by initials.